1  YOLANDA HUANG, CA SBN 104543
2  PO Box 5475
   Berkeley, CA 94705
3  Tel: (510) 329-2140/ Fax: (510) 580-9410

4  DAN SIEGEL SBN 56400
5  ANNE WEILL  SBN 139845
   SIEGEL & YEE
6  499 14th Street, 3rd Floor
   Oakland, CA 94612
7  Tel: (510) 839-1200/ Fax:  (510) 444-6698

8
9  Attorneys for Plaintiffs
   STEVEN ANGELL, *et al.* and on
10 behalf of the proposed class

11

12          **UNITED STATES DISTRICT COURT**

13         **NORTHERN DISTRICT OF CALIFORNIA**

14

15 STEVEN ANGELL, MILES AVERY,
16 MOLLY BATCHELDER, SRI LOUISE also
   known as Louise Coles,  CICILY COOPER,
17 SHAREEF ELFIKI, THEODORE HECTOR,
   LINDSAY WEBER, Individually and on
18 behalf of others similarly situated,

19
               Plaintiffs,
20        vs.

21 CITY OF OAKLAND, COUNTY OF
22 ALAMEDA, HOWARD JORDAN,
   JEFFREY ISRAEL, ERIC BRESHEARS,
23 RON YELDER, DARREN ALLISON,
24 STEVE TULL, EDWARD TRACEY,
   ANTHONY RACHAL, SEAN WHENT,
25 GREGORY J. AHERN, BRETT KETELES,
26 CARLA KENNEDY, DAVID BRADY,
   GREGORY L. MORGADO, KERRY
27 JACKSON, DOES 1-250.

28              Defendants.

Case No. **C13-0190** NC

CIVIL RIGHTS CLASS ACTION
COMPLAINT FOR DAMAGES AND
INJUNCTIVE AND DECLARATORY
RELIEF

DEMAND FOR JURY TRIAL



FILED
JAN 1 4 2013
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

ADR

Page 1 of 26

*Angell v. City of Oakland*
Complaint

**INTRODUCTION**

1.       This is a civil rights class action arising from the unconstitutional and unlawful arrest and incarceration of approximately 409 people by the Oakland Police Department, Alameda County Sheriff's Office and multiple agencies working in joint action and providing mutual aid under the direction of the Oakland Police, on January 28, 2012.

2.       That day, hundred of individuals participated in an "Occupy Oakland" rally and march to protest the economic inequalities of our country, state and city; and the utilization of resources by and for the "1%" instead of for "99%". Oakland Police and other law enforcement agencies, under color of law, in their efforts to stop the lawful First Amendment activity, and corralled and trapped plaintiffs who were marching and others in the area.

3.       Without a dispersal order or other warning, class members were detained, arrested, transported to an Alameda County jail, and imprisoned for 12 and 85 hours.  Class members include members of the press corp, with valid press identifications, medics, legal observers, and non-march bystanders.  Rather than cite and release, class members were incarcerated for long periods in overcrowded and inhumane conditions, including unheated or deliberately chilled cells, with limited seating, no sleeping facilities, sometimes standing room only, no toilet facilities, no feminine hygiene, and no food, water or medical care.

4.       The Oakland Police Department's actions, including the wrongful mass arrest and imprisonment, violated multiple provisions of the Oakland Police Crowd Management/ Crowd Control Policy that was entered into by stipulation of the parties and order of the United States District Court in settlement of plaintiffs' claims for injunctive relief in *Coles, et al. v. City of Oakland* (No.C03-2961 THE) and *Local 10, International Longshore and Warehouse Union, et al. v. City of Oakland*, (Nos. 2962 THE), on December 24, 2004.

5.       Plaintiffs further allege that the police and sheriff's department actions were the result of continuing unlawful and unconstitutional policies and practices of the City of Oakland, the Oakland Police Department  ("OPD"), Alameda County and the Alameda County Sheriff's Office ("ACSO").   On numerous prior occasions, including January, 2009, July 8, 2010, and November 5, 2010 during public protests of the Oscar Grant

*Angell v. City of Oakland*
Complaint

shooting and the Johannes Mehserle verdict; OPD similarly violated the Crowd Management/Crowd Control Policy by trapping demonstrators, use of excessive force, failure to give dispersal orders or to permit marchers to disperse, by conducting mass arrests, holding people in jail on misdemeanors charges in over crowded and inhumane condition rather than citing and releasing people. *Spalding v. City of Oakland* (no. 3:2011-cv-02867).

6.     This ongoing and continuing OPD and ACSO misconduct create a substantial chilling effect and deterrent to future First Amendment protected activity in Oakland. The named plaintiffs, on behalf of a class of all those arrested in the January 28, 2012, mass arrest in the vicinity of Broadway between 23rd and 24th Streets, Oakland, intend to participate in peaceable protests and assemblies in the City of Oakland in the future.

7.     Defendants' actions deprived the plaintiff class of their right to freedom of speech and association; the right to be free from unreasonable searches and seizures; the right to equal protection of the laws and to due process of law; the right to be free from the use of excessive and/or arbitrary force; and the right to privacy, all guaranteed by the United States and California Constitutions, as well as additional state law claims relating to the police actions complained of herein.

8.     Class Plaintiffs, on behalf of themselves and the class, seek damages and declaratory and injunctive relief to restrain defendants from continuing to violate plaintiffs' federal and state constitutional and statutory rights, the protections for these rights in the Oakland Crowd Management/ Crowd Control Policy, and from using false arrests, false imprisonment, unreasonable conditions of confinement, and other unlawful actions to disrupt, interfere with and deter future demonstrations and protest activities in the City of Oakland and Alameda County.  Class plaintiffs seek an injunction requiring the Defendants to seal, return and/or destroy any records of Plaintiffs' and class members' arrests, including all biological samples.  Class Plaintiffs, on their own behalf and the behalf of the class, also seek monetary damages for the injuries they suffered when they were falsely detained, arrested and imprisoned.

**JURISDICTION**

9.      The jurisdiction of the Court is invoked pursuant to 42; U.S.C. § 1983 et seq.; 28 U.S.C. §§ 1331 and 1343(a).  Supplemental jurisdiction over state law claims exists pursuant to 28 U.S.C. § 1367. Venue is proper in the Northern District of California as the events complained of occurred in this district.

10.      Plaintiffs have filed administrative claims with the City of Oakland and Alameda County in compliance with California Government Code §§ 910, et seq.  The claims have been denied expressly or by operation of law.

**INTRADISTRICT ASSIGNMENT**

11.      The claims alleged herein arose in the City of Oakland, State of California. Therefore, venue and assignment lies in the United States District Court for the Northern District of California, San Francisco Division or Oakland Division.

**THE PARTIES**

The Plaintiffs

15.      **Stephen Angell** is student and a resident of the City of Oakland.   Mr. Angell joined the march at Frank Ogawa Plaza and along with other class members was herded, threatened with batons and tear gas, corralled and trapped by defendants OPD, ACSO and other peace officers in the detainment area.

16.      Pressed up against the doors of the Oakland YMCA, Mr. Angell, entered the YMCA after the YMCA staff opened its doors.  Defendants OPD, ACSO and other peace officers, while threatening class members with firearms, arrested, handcuffed and removed Mr. Angell and several other class members from the YMCA.

17.      Mr. Angell did not commit a crime, was never ordered or allowed to disperse and did not witness or hear any police warnings prior to being herded, corralled and trapped by Defendants in the detainment area.

18.      Mr. Angell was unlawfully detained and prevented from leaving the detainment area by defendants OPD, ACSO and other peace officers  for approximately two to three hours

*Angell v. City of Oakland*
Complaint

before he was transported to Santa Rita Jail. With Mr. Angell, was an individual who had not participated in the March and had entered the Y seeking warmth and refuge from the police action. This individual was ill, distressed and vomited on the bus. The bus driver and the guards on the bus ignored the ill individual, and provided no medical care. Once at Santa Rita, class members were held on the bus for period of time before being moved into Santa Rita jail.

19.  At Santa Rita jail, Mr. Angell separated from other class members, strip-searched, dressed in jail clothing and placed into a freezing cold room without adequate clothing or bedding. The only place to sleep was to lie on the icy ground. Thereafter he was required to undergo a tuberculosis test and other examinations and then placed with the general prison population. When he was moved into the main housing with the general prison population, sheriff deputies attempted to incite the regular prison inmates to take violent action against Mr. Angell by announcing to general jail inmates that all inconveniences, deprivation of privileges, and other irregularities should be blamed on Mr. Angell, and that the general jail inmates should take any and all frustrations they have with the conditions of their incarceration, out on Mr. Angell. This caused Mr. Angell great fear and emotional distress as he was concerned that he would be subject to physical attack and violence.

20.  Four days later, on February 1, 2012, Mr. Angell was transported to court, where charges were not filed. Mr. Angell was not immediately released but required to remain in custody and return to Santa Rita. At Santa Rita he was again held for hours, and during this time, he was denied all food and water and told that he would not be released unless he provided a biological sample of his DNA. Based upon the threat of continued incarceration, the deprivation of food and water, Mr. Angell provided a biological sample. Mr. Angell was held over 84 hours and finally released in the morning of February 2, 2012. Mr. Angell was never charged.

21.  **Miles Avery** is a resident of Oakland and of Alameda County. Mr. Avery joined the march at Frank Ogawa Plaza. Mr. Avery, along with other class members was herded, threatened with batons and tear gas, corralled and trapped by defendants OPD, ACSO and other peace officers in the detainment area.

*Angell v. City of Oakland*
Complaint

22.     While the class members were being squeezed by defendants into a smaller and smaller space by the YMCA, Mr. Avery spoke out and stated that no dispersal order had been given and there was no probable cause for arrest.  In response a number of  uniformed peace officers  grabbed Mr. Avery, pulled him out of the crowd and threw him face down onto the ground.  One peace officer twisted his right arm behind his back, and put plastic handcuffs on.  Another peace officer  put his knee onto Mr. Avery's brain stem, and kneeled on Mr. Avery head, thereby grounding Mr. Avery's face into the concrete, causing cuts and scrapes and bleeding.  Simultaneously, other peace officers administered blows to Mr. Avery's organs and lower back while they yelled that this is what happens when you resist arrest.

23.     Then one or more peace officers dragged Mr. Avery to the side while they started arresting the rest of the group.  Mr. Avery was then put on an over crowded bus to Santa Rita, where defendant guards and peace officers tried to force Mr. Avery and another individual into a metal cage which was only big enough for one person.  When the sheriff guards and peace officers attempted to close the door to the cage, the door would not close.  As a result an officer, hauled Mr. Avery out, threw him against the bus, and yelling in Mr. Avery's face that if he did not do exactly what he was told, they would make his life "hell".

24.     In Santa Rita, Mr. Avery was told that he was arrested for failure to disperse, and for "verbally resisting" arrest, and placed in a holding cell over night.  The next morning, everyone else was cited and released, but Mr. Avery was moved into a solitary cell, and held in two different solitary cells for most of the day.  During this day, he was denied food and denied access to a telephone.  Late that afternoon, Mr. Avery was moved out of solitary confinement into a regular holding cell.  In the middle of the night, he taken out and dressed in a blue prison jump suit.  That evening, he was able to, for the first time, telephone his father, who then posted cash bail of $7,000.00

25.     Two days later, after bail had been posted, Mr. Avery was moved to a large holding cell with a capacity for about 20 people, in preparation for being released.  Throughout the day, more and more people were moved into that cell, so that at one point, the cell was so

over crowded, there was standing room only. People were so tightly packed in, no one could raise his arms. There was no ventilation and due to the circumstances, tempers started to flare. There was no toilet in the cell, so the people packed into the release cell had to urinate on the concrete floor or on clothing, which they piled in the corner to soak up the urine. Mr. Avery heard a sheriff's deputy state that anyone who pushed the emergency button would be punished with additional incarceration unless it was because someone was dying. Mr. Avery was finally bailed out after over 54 hours of incarceration, and never charged with any crime.

26.   **Molly Batchelder** is a resident of Oakland and of Alameda County. While participating on the Occupy Oakland march on January 28, 2012, she found herself squeezed into the front of the Oakland YMCA, facing a row of armed police, dressed in riot gear, and with armed police behind her, brandishing weapons, so that she had no ability to leave the area. Ms. Batchelder, along with other class members was herded, threatened with batons and tear gas, corralled and trapped by defendants OPD, ACSO and uniformed peace officers in the detainment area.

27.   She never heard a dispersal order until after she was informed that she was being arrested. She loudly requested the opportunity to disperse, and verbally asserted her constitutional rights under the 1st and 4th Amendment of the United States Constitution.

30.   Hearing Ms. Batchelder's statements, uniformed peace officers grabbed Ms. Batchelder, threw her to the ground, and beat her with batons, resulting in head injuries. Ms. Batchelder suffered injuries to her body, face and head. She was then handcuffed, placed in a van and transported to Glen Dyer jail. Once at Glen Dyer, Ms. Batchelder was forced to take a pregnancy test, and released from imprisonment 12 hours later. She received no medical attention. Ms. Batchelder was never charged.

31.   **Sri Louise** also known as Louise Coles is long time resident of the City of Oakland and the County of Alameda, marched in the Occupy Oakland march of January 28, 2012, as a member of the Interfaith Tent at Oakland. A yoga teacher, she marched carrying a flower and a picture of the Hindu god Ganesha in her hand. Ms. Coles along with other class members was herded by batons and tear gas, corralled and trapped by Defendants

*Angell v. City of Oakland*
Complaint

into the detainment area.

32.   Ms. Coles did not commit a crime, was never ordered or allowed to disperse and did not witness or hear any police warnings prior to being herded, corralled and trapped by defendants OPD, ACSO and other peace officers in the detainment area. Upon being detained, a police officer or sheriff ripped the flower out of Ms. Coles' hand and threw it on the ground. Ms Coles was standing close to Molly Batchelder and saw defendants grab and throw Ms. Batchelder to the ground and beat her with batons. Ms. Coles was unlawfully detained and prevented from leaving the detainment area by uniformed officers for approximately two hours before she was handcuffed and transported to Santa Rita jail. During the transport, one of the women on Ms. Coles' bus yelled that her cuffs were too tight. The guards, the deputies, the driver and other individuals employed by OPD and ACSO ignored this woman and did not even check the handcuffs. The deputies on the bus told Ms. Coles that class members were receiving the treatment they deserved.

33.   At Santa Rita Jail, Ms. Coles was held in four different holding cells. All the holding cells were freezing cold, with cold air blowing in through ceiling vents. In the overcrowded holding cells, many of the class members did not have adequate clothing for the freezing temperatures, and the women took to sharing jackets to stay warm. In one instance, a woman class member began to menstruate, and it required the collective yelling of the entire cell for a very long period of time, before a guard came by, and even longer before a menstrual pad was provided.

34.   The class members were held without communication or information for extended periods of time. The guards made a ritual of coming once every few hours, to read names off of a list, and for the first 15-20 hours, none of the people in the holding cell were on the list. The guards would not explain the process, nor why class members were being held, nor when anyone would be permitted to make a phone call. Ms. Coles was not permitted a phone call until after 30 hours of imprisonment. None of the women she was placed in holding cells with were permitted to make a phone call until 30 to 40 hours had elapsed. Ms. Coles was imprisoned for 53 hours and never booked nor charged.

35.   **Cicily Cooper** is a resident of the City of Oakland and County of Alameda. Ms.

Cooper joined the march at Frank Ogawa Plaza. Ms. Cooper marched and chanted with other class members, did not commit a crime, was never ordered or allowed to disperse and did not witness or hear any police warnings prior to being herded, corralled and trapped by defendants OPD, ACSO and other peace officers in the detainment area. Ms. Cooper was held at the detainment area for approximately four hours, and denied access to toilet facilities, and forced to urinate on the cement. Thereafter, she was transported on a very cold bus with its windows open, to Santa Rita, where they were kept on the bus for an additional extended period of time. Individuals on the bus who requested access to toilet facilities were told to urinate on themselves and their clothes.

36. Once in Santa Rita, Ms. Cooper was forced to take a pregnancy test, and then held in a holding cell of approximately 10 feet by 10 feet with 24 other women, one bench and one toilet, and not enough room for everyone to sit and only the floor upon which to lay down. The room was unheated and icy cold with no blankets, no bedding and no extra clothing. Ms. Cooper was imprisoned for over 50 hours. Ms. Cooper was never charged.

37. **Shareff Elfiki** is a resident of the City of Oakland, and the County of Alameda. He participated in the Occupy Oakland march of January 28, 2012. Mr. Elfiki joined the march at Frank Ogawa Plaza. Mr. Elifiki along with other class members was herded, corralled and trapped by defendants OPD, ACSO and other peace officers in the detainment area.

38. Mr. Elifiki did not commit a crime, was never ordered or allowed to disperse and did not witness or hear any police warnings prior to being herded by batons and tear gas, corralled and trapped in the detainment area. Mr. Elifiki was unlawfully detained and prevented from leaving the detainment area by defendants OPD, ACSO and other peace officers or approximately forty-five minutes before he was arrested and forced to sit on the ground for another hour and a half and then transported to Santa Rita jail. He was held in Santa Rita for 20-21 hours before he was released. Mr. Elfiki was never charged.

39. **Theodore R. Hexter** is an individual with a serious viral condition, commonly described as HIV. He is a resident of San Francisco, and participated in the Occupy Oakland march of January 28, 2012. Mr. Hexter did not commit a crime, was never

ordered or allowed to disperse and did not witness or hear any police warnings prior to being herded by batons and tear gas, corralled and trapped by defendants OPD, ACSO and other peace officers in the detainment area. Mr. Hexter was arrested and then transported to Santa Rita jail.

40. During his arrest, and incarceration, Mr. Hexter repeatedly told deputies that he is HIV positive and requested the prescription he is required to take once a day. His belongings were confiscated and his requests were ignored or denied. Although Mr. Hexter was imprisoned for three days, he was told that since he was destined to be cited and released, ACSO provided no medical care for the cite and release population in its custody. Mr. Hexter was imprisoned in Santa Rita for three days before he was released. Mr. Hexter was never charged.

41. **Lindsey Weber** is a resident of the City of Oakland and the County of Alameda. Ms. Weber joined the march at Frank Ogawa Plaza. Ms. Weber, while marching and chanting, along with other class members was herded by uniformed officers with batons and tear gas, corralled and trapped by said officers in the detainment area. Ms. Weber did not commit a crime, was never ordered or allowed to disperse and did not witness or hear any police warnings prior to being herded, corralled and trapped by defendants OPD, ACSO and other peace officers in the detainment area. She never heard a dispersal order until after she was informed that she was being arrested. She loudly requested the opportunity to disperse. As she made her requests, she was pulled out of the group by defendants, placed in a van and transported to Glen Dyer jail. Once at Glen Dyer, Ms. Weber was forced to take a pregnancy test, and imprisoned for 12 hours. Ms. Weber was never charged.

City of Oakland

42. Defendant **City of Oakland** is a charter city, organized under the constitution and the laws of the State of California. The City of Oakland employs and directs the Oakland Police Department ("OPD"), a number of individual Defendants, Howard Jordan, Jeffrey Israel, Eric Breshears, Ron Yelder, Darren Allison, Steve Tull, Edward Tracey, Anthony Rachal, Sean

1  Whent; and is responsible for the policies, practices and customs of the OPD, its Bureau of

2  Field Operations, Bureau of Risk Management and Chief of Police.

3  43.  Defendant **Howard A. Jordan** is, and at all times relevant herein was, the Chief of

4  Police of the City of Oakland, with responsibility for supervising, training, assigning,

5  administrating and controlling all officers and employees of the OPD.  Chief Jordan held a

6  command and/or policymaking position and he along with other Command members

7  identified below, participated in the planning, supervision, and the execution of the police

8  conduct complained of herein.

9  44.  Defendant **Jeffrey Israel,** currently a captain in the Oakland Police Department, and at

10  all times relevant herein was deputy chief of police of the Oakland Police Department.

11  Defendant **Eric Breshears** is and at all times relevant herein was, a deputy chief of police of

12  the Oakland Police Department.  Defendants Israel and Breshears were the two Incident

13  Commanders with for responsibility for implementing and executing the "Incident Command

14  System" and the Operations Plan for January 28, 2012 Occupy Oakland march and assembly.

15  Defendant Israel and Breshears were employees of OPD and held a command and

16  policymaking position.  They along with Defendant Jordan and other Command members

17  identified below, participated in the planning, supervision, and the execution of the police

18  conduct complained of herein.

19  45.  Defendants **Ron Yelder, Darren Allison, Steve Tull, Edward Tracey, Anthony**

20  **Rachal,** and **Sean Whent,**  at all times relevant herein, were captains in the Oakland Police

21  Department and employees of the OPD who held supervisory, command and/or policy-

22  making positions, and who are named in the OPD Operations Plan as the officers who

23  participated in the authorization, planning, supervision, and the execution of the police

24  conduct complained of herein at the detainment site.  Additionally, upon information and

25  belief, one or more of these Defendants failed, with deliberate indifference to Plaintiffs' and

26  class members' rights, to adequately train and supervise OPD officers who were involved in

27  violating the rights of the Plaintiffs and class members.

28

*Angell v. City of Oakland*
Complaint

Alameda County

46.     Defendant **County of Alameda**, is a public entity organized under the California Constitution and laws of the State of California, and is responsible for the policies and funding of the Alameda County Sheriff's Office.

47.     Sheriff **Gregory Ahern**, is an official of Alameda county, as defined in Government Code §24000,  with responsibility for supervising, training, assigning, administrating and controlling all deputy sheriffs and employees of the Alameda County Sheriff's Office ("ACSO").   Sheriff Ahern held a command and/or policymaking position and he along with other Command members identified below, participated in the planning, supervision, and the execution of defendants' conduct complained of herein.

48.     Defendant **Brett Keteles**, is and at all times was the assistant Sheriff and the Commander in charge of detention and corrections for the ACSO.  Commander **Carla Kennedy**, is and at all times mentioned herein, was the second in command for detention and corrections.  Assistant Sheriff Brett Keteles and Commander Carla Kennedy as employees of ACSO and as the detention and corrections commanders for ACSO,  held command and policymaking positions.  They, along with Defendant Ahern, and other Command members identified below, participated in the planning, supervision, and the execution of the detention of the class members in the Alameda county jail facilities and ACSO's conduct complained of herein.

49.     Defendants **David Brady, Gregory L. Morgado, and Kerry Jackson** are and at all times were captains of ACSO in charge of detention and corrections and Alameda county jails, in which class members were incarcerated.  **David Brady** is and was the responsible officer for Glen Dyer Jail.  **Gregory Morgado** is and was the responsible officer for Santa Rita Jail.  **Kerry Jackson** is and was in charge of Detention and Corrections.  David Brady, Gregory Morgado and Kerry Jackson, at all times relevant herein, were employees of the ACSO who held supervisory, command and/or policy-making positions, and who participated in the authorization, planning, supervision, and the execution of the police conduct and

*Angell v. City of Oakland*
Complaint

1    sheriff's conduct complained of herein.  Additionally, upon information and belief, one or

2    more of these Defendants failed, with deliberate indifference to Plaintiffs' and class

3    members' rights, to adequately train and supervise ACSO sheriff's deputies and staff who

4    were involved in violating the rights of the Plaintiffs and class members.

5    50.    At all times relevant herein, all of the above individual Defendant were officers and

6    employees were acting under the color of law, under color of authority and in the scope of

7    their employment as Command and Supervisory Personnel of the Oakland Police Department

8    or the Alameda County Sheriff's Office.  All of the above individual defendants are sued in

9    their individual and official capacities.

10   51.    Plaintiffs are ignorant of the true names and/or capacities of defendants sued herein as

11   DOES 1 through 250, inclusive, and therefore sue said defendants by such fictitious names.

12   Plaintiffs will amend this complaint to allege their true names and capacities when

13   ascertained.  The Doe defendants include other government entities, as well as individuals,

14   who participated in the conduct complained of herein. Plaintiffs are informed and believe and

15   therefore allege that each of the Doe defendants is legally responsible and liable for the

16   incident, injuries and damages hereinafter set forth, and that each of said defendants

17   proximately caused said incidents, injuries and damages by reason of their negligence, breach

18   of duty, negligent supervision, management or control, violation of constitutional and legal

19   rights, or by reason of other personal, vicarious or imputed negligence, fault, or breach of

20   duty, whether severally or jointly, or whether based upon agency, employment, or control or

21   upon any other act or omission.  Plaintiffs will ask leave to amend this complaint to insert

22   further charging allegations when such facts are ascertained.

23

24   52.    Each of the defendants, including defendants DOES 1 through 250, caused, and is

25   responsible for, the below-described unlawful conduct and resulting injuries by, among other

26   things, personally participating in the unlawful conduct or acting jointly or conspiring with

27   others who did so; by authorizing, acquiescing in or setting in motion policies, plans or

28   actions that led to the unlawful conduct; by failing to take action to prevent the unlawful

*Angell v. City of Oakland*
Complaint

1  conduct; by failing and refusing with deliberate indifference to plaintiffs' rights to initiate and
2  maintain adequate training and supervision; and by ratifying the unlawful conduct that
3  occurred by agents and officers under their direction and control, including failing to take
4  remedial or disciplinary action.

5  53.    In doing the acts alleged herein, defendants, and each of them, acted within the course
6  and scope of their employment.

7  54.    In doing the acts and/or omissions alleged herein, defendants, and each of them, acted
8  under color of authority and/or under color of law.

9  55.    In doing the acts and/or omissions alleged herein, defendants, and each of them, acted
10  as the agent, servant, employee and/or in concert with each of said other defendants.

11

12                              **CLASS ALLEGATIONS**

13  56.    Class Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal
14  Rules of Civil Procedure and seek to pursue claims for damages, injunctive and declaratory
15  relief on behalf of themselves and all persons similarly situated.

16  57.    The proposed class consists of persons who were herded, corralled and then arrested in
17  the mass arrest that occurred on the evening of January 28, 2012 on Broadway in Oakland,
18  between 23rd and 24th Street. Each single class member was detained, arrested, imprisoned
19  and never charged with any crime.

20

21  58.    The named plaintiffs' allege that their First, Fourth and Fourteenth Amendment rights
22  and their state law and common law rights against false arrest and false imprisonment were
23  violated, raising common questions of law and fact.

24  59.    By encircling and arresting all of the demonstrators, as well as observers, and
25  bystanders who happened to be in the area, without probable cause or lawful justification, and
26  without any warning or opportunity to disperse, defendants acted on grounds generally
27  applicable to the class.

28

*Angell v. City of Oakland*
Complaint

60.    The claims of the named plaintiffs are typical of the claims of the class.  The claims of the class members arise from the actions that resulted in damages to the class representatives and are based on the same legal theories.

61.    The representative plaintiffs will fairly and adequately protect the interests of the class because they were subject to the unlawful law enforcement conduct complained of herein, and have no interests antagonistic to other members of the class.  In addition, plaintiffs' counsels are experienced in litigating federal civil rights cases and class actions.

62.    The defendants have acted and refused to act on grounds generally applicable to the class, and injunctive and declaratory relief for the class as a whole is appropriate.

63.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or incompatible standards of conduct for the defendants, thereby making a class action the superior method of adjudicating the controversy.

## FACTUAL ALLEGATIONS

64.    On January 28, 2012, class members and others, participated in an "Occupy Oakland" political protest demonstration, exercising their Constitutional Rights to freedom of speech, assembly and association under the federal and state constitutions, to protest economic inequalities and injustice in our country, our state and our city; to protest the role of our city government in the diversion of public resources and public funds to "the 1%" and for the benefit of "the 1%" instead of for "the 99%" and the benefit of "the 99%", as well as wholesale foreclosures of homes in the City of Oakland, and the fact that the City of Oakland and the State of California, own and possess or control numerous vacant homes which are not available to families who have been foreclosed on and/or are homeless.

65.    In the late afternoon of January 28, 2012, after speeches, music and the sharing of food in Frank Ogawa Plaza, roughly 500 to 1,000 people engaged in spirited chanting, and exercising constitutional rights, commenced marching.  As the marchers went north on Telegraph Avenue, a large force of police and peace officers was deployed to herd and corral them and stop the lawful First Amendment activity.  Near or just past 19th Street, squads of

officers began to attack the crowd, pushing from behind, rushing in swinging batons, discharging "flash-bang" grenades and tear gas.   OPD and peace officers who responded to OPD's request for mutual aid created a formation directly behind the marchers, so that the marchers and class members were herded forward. At 23rd Street, the marchers turned right, and right again on Broadway with the goal of returning to Frank Ogawa Plaza, the terminus of the march.

66.    Police and peace officers erected a police line on 24th street, blocking all passage down Broadway past 24th street. The marchers, together with a number of other people who were not part of the march—on Broadway, between 23rd and 24th Streets were completely corralled and confined between two walls of armed police and peace officers.  To avoid crossing the police lines in order to avoid being physically injured by the police, and because there were no side streets or other exits, the marchers congregated in the middle of the block, where the YMCA is located.  No dispersal orders were given and no one gave orders or announcements telling the marchers where to go or what to do until after defendant OPD announced that all class members were under arrest.

67.    Class members were not simply contained between the two lines of police and deputies, Class members were pushed, clubbed, and driven into a shrinking space by these two advancing lines. The unjustified tactics of OPD and Police created a melee, filling the crowd with confusion, panic and fear; causing numerous injuries to plaintiffs and class members. There was no exit except into the YMCA. Class members requested that YMCA staff open the YMCA's doors. Some number entered the YMCA; and some number quickly left, through a rear exit. Others were stopped by police and deputies, pointing these firearms at them, while ordering them to lie down on the ground.

68.    The entire now-encircled group, of some 400 - 500 people, was, without probable cause, placed under arrest, allegedly for failure to disperse, although they were given no notice or opportunity to disperse.   After the announcement of arrest, class members, repeatedly requested permission to disperse, which permission was denied. Anyone who attempted to do so was met with the use of force, causing injuries.

69.     The police and deputies, unprovoked, caused additional injuries by pushing, attacking and battering class members who verbally challenged the arrests as without probable cause. Those arrested inside the YMCA were charged with felony burglary, resulting in high bail and extended imprisonment.   Journalists with press passes were included in these false arrests, in direct contravention to OPD policy.   Medics, legal observers and some bystanders were detained, arrested and incarcerated.   Rather than cite and release class members, the decision was made to arrest and transport class members to a county jail, which subjected class members to  imprisonment for some period of time.

70.     Class members corralled at the detainment area, without probable cause or lawful justification, were forced to stand or sit in the street for hours.   Class members were not allowed to use toilet facilities, so the only place to relieve themselves was on the street or in their clothing.   Some class members were placed on buses and held there for further long periods without access to toilet facilities, and some had medical conditions that required access to toilet facilities, and ended up soiling themselves and urinating on the bus.   As a result class members suffered discomfort, embarrassment and humiliation.   Class members with medical needs were barred from taking their medications, and prescribed medications were confiscated.

71.     After detaining the class members on the street, in the growing cold, OPD, ACSO and other peace officers tied each of the class members hands with plastic handcuffs behind their backs.   Class members were kept handcuffed for inordinate and unnecessarily long periods of time, and handcuffs/ties were intentionally or heedlessly applied much too tightly—causing pain, extended discomfort, and injuries.   Officers and deputies refused to loosen or remove the handcuffs until the class members arrived at the jail, late that night or in the early morning.

72.     Class members were loaded  onto buses and vans.   The lengthy detention on the cold street was followed with lengthy waits on cold buses where the windows were open.   Class members were driven on the freeway for 45 minutes to Santa Rita Jail, enduring wind and cold.   Some class members were taken to Glen Dyer Jail in Oakland, but the majority was taken to Santa Rita Jail in Dublin.

*Angell v. City of Oakland*
Complaint

73.    ACSO deputies ordered female class members to submit to a pregnancy test and ordered to urinate into a cup. If a class member tried to decline the pregnancy test, ACSO deputies threatened her with separation from other class members, isolation and a longer period of incarceration. Female class members were embarrassed and humiliated by the forced urination and pregnancy testing.

74.    At Santa Rita, class members were held in extremely over-crowded cells and other spaces, which lacked cots or other sleeping surfaces. Many class members were so over-crowded that there was not room for everyone to sit or lie down on the floor. Class members were held incommunicado. Phone calls were denied for long periods of time. Class members were denied access to legal counsel. Toilets and sanitary facilities were inadequate or non-existent. Means for personal hygiene, particularly feminine hygiene were denied. The cells were extremely cold. Despite the winter weather, cold air was continually being blown in and class members' extra clothes were taken away. No one was provided with blankets or other means to stay warm. Some were deprived of food and water for extended periods of time. Class members with particular medical needs continued to be deprived of needed medical care, and medication. Class members were subjected to physical and mental abuse and other inhumane and unreasonable conditions of confinement, which caused them to suffer pain, discomfort, distress and injury.

75.    ACSO staff and deputies instructed, attempted to provoke and motivate other, non-claimant, in-custody individuals to threaten, intimidate, attack and otherwise injure class members. When class members were transferred out of holding cells into the main housing units, ACSO staff and deputies maliciously informed other in-custody individuals that all deprivations and problems they experienced were the fault of class members, in an attempt to foment hostility and violence by regular incarcerated individuals against class members. ACSO staff and deputies engaged in threats, taunts and other verbal abuse against class members.

76.    All class members at Santa Rita were held for excessive periods, with those arrested on felony charges, held for four days before release. Even after the district attorney in court declined to file charges, these class members arrested were required to ride the bus back to

Santa Rita, endure continued imprisonment without food and water. ACSO and its deputies demanded that all those wrongfully arrested on felony charges surrender buccal swab samples of their DNA, stating that any class member who did not surrender a buccal swab of DNA, would not be released.

77. Some class members were ultimately released without booking or citations. Others were released with citations. As with the arrests, there was no cause or reason or justification for class members to be transported to jail and incarcerated. These actions were taken to deter class members from public protest and the exercise of free speech.

78. None of the class was charged or prosecuted, but all now have arrest records. and will incur legal costs to attempt to have the arrests removed from the records.

79. In 2004, the Oakland Police Department adopted a comprehensive Crowd Management/ Crowd Control Policy, in settlement of plaintiffs' claims for injunctive relief in *Coles, et al. v. City of Oakland* (No. C03-2961, TEH) and *Local 10, International Longshore and Warehouse Union, et al. v. City of Oakland*, (No. C03-2962 THE), which litigation arose from the OPD shootings of peaceful demonstrators and longshoremen with wooden bullets and other "less lethal" projectiles during an antiwar demonstration. The Policy was incorporated into the Stipulation and Order approving the class settlement on December 24, 2004. The Policy was made into an OPD Training Bulletin and all members of OPD were required to be trained on the Policy on an ongoing basis.

80. The Police Action of January 28, 2012 violated numerous provisions of the OPD Crowd Management/ Crowd Control Policy, including, but not limited to, ¶ 8(F), which specifies that mass arrest may be carried out only after the specific requirements and procedures for declaring an unlawful assembly have been followed. And these procedures require negotiations, a dispersal order, and an opportunity for marchers to disperse, none of which were provided to class members.

81. The OPD Crowd Management/ Crowd Control Policy was also violated when officers and deputies following defendant OPD's directions, arrested all class members without the requisite probable cause required for each individual arrest. Section *IX(A)(5)* of the *Crowd Control Policy* instructs that *"Individuals may not be arrested based on their association with*

*a crowd in which unlawful activity has occurred. There must be probable cause for each individual arrest. "*

82.    In violation of ¶ X of the *Crowd Control Policy,* and contrary to California Penal Code section 853.6, defendants OPD and ACSO jailed class members arrested on misdemeanors, instead of release with a citation.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
Violation Of First Amendment To The United States Constitution
(42 U.S.C. § 1983)

83.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 of this complaint.

84.    Defendants' above-described conduct violated plaintiffs' rights to freedom of speech and association under the First Amendment to the United States Constitution.

### SECOND CLAIM FOR RELIEF
Fourth Amendment To United States Constitution
(42 U.S.C. § 1983)

85.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 of this complaint.

86.    Defendants' above-described conduct violated plaintiffs' rights to be free from unreasonable seizures and excessive and/or arbitrary force and/or arrest and/or imprisonment without reasonable or probable cause under the Fourth Amendment to the United States Constitution.

///

Page 20 of 25

*Angell v. City of Oakland*
Complaint

THIRD CLAIM FOR RELIEF

Fourteenth Amendment To United States Constitution

(42 U.S.C. § 1983)

87.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 of this complaint.

88.     Defendants' above-described conduct violated plaintiffs' right to not be deprived of liberty without due process of law under the Fourteenth Amendment to the United States Constitution.

FOURTH CLAIM FOR RELIEF

Fourteenth Amendment To United States Constitution

(42 U.S.C. § 1983)

89.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 of this complaint.

90.     Defendants' above-described conduct violated plaintiffs' rights to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

FIFTH CLAIM FOR RELIEF

False Arrest and False Imprisonment

91.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 of this complaint.

92.     Plaintiffs were arrested and imprisoned without reasonable or probable cause to believe that they committed any crime.

93.     Defendants intentionally imprisoned the class in the Alameda County Jail in violation of Penal Code §853.6, and for an unreasonably prolonged period of time and under unreasonably inhumane conditions.

SIXTH CLAIM FOR RELIEF

Violation of California Civil Code § 51.7

94.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 of this complaint.

*Angell v. City of Oakland*
Complaint

95.    Defendants' above-described conduct violated plaintiffs' right to be free from violence and intimidation by threat of violence because of their actual or perceived political affiliation and/or viewpoint, in violation of California Civil Code §51.7.

### SEVENTH CLAIM FOR RELIEF
### Violation of California Civil Code §52.1

96.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 of this complaint.

97.    Defendants' above-described conduct constituted interference, and attempted interference, by threats, intimidation and coercion, with plaintiffs' peaceable exercise and enjoyment of rights secured by the Constitution and laws of the United States and the State of California, in violation of California Civil Code §52.1.

### EIGHTH CLAIM FOR RELIEF
### California Constitution, Article I, §1

98.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 of this complaint.

99.    The above-described acts of defendants, including, but not limited to, the forced pregnancy, tuberculosis and DNA testing and the collecting of information concerning plaintiffs' speech and associational activities, violated plaintiffs' right to privacy under article I, §1 of the California Constitution.

### NINTH CLAIM FOR RELIEF
### Negligence

100.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 of this complaint.

101.    Defendants have a duty of care to plaintiffs to ensure that defendants did not cause unnecessary or unjustified harm to plaintiffs, and a duty of care to hire, train, supervise and discipline OPD and ACSD officers so as to not cause harm to plaintiffs and to prevent violations of plaintiffs' constitutional, statutory and common law rights.

*Angell v. City of Oakland*
Complaint

1  102. The above-described acts and omissions of defendants breached the duty of care
2  defendants owed to the named individual plaintiffs.

3  **REQUISITES FOR RELIEF**

4  103. Plaintiffs are informed and believe that the violations of the plaintiffs' constitutional
5  and lawful rights complained of herein were caused by customs, policies, directives,
6  practices, acts and omissions of authorized policy makers of the defendants CITY OF
7  OAKLAND, OPD, COUNTY OF ALAMEDA, ACSO including defendants JORDAN,
8  AHERN, ISRAEL, BRESHEARS, YELDER, ALLISON, TULL, TRACEY, RACHAL, and
9  WHENT, GREGORY J. AHERN, BRETT KETELES, CARLA KENNEDY, DAVID
10 BRADY, GREGORY L. MORGADO, KERRY   and other supervisory officials and
11 employees of the OPD, and of the ACSO who encouraged, authorized, directed, condoned,
12 and ratified the unconstitutional and unlawful conduct complained of herein. Said customs,
13 policies and practices include, but are not limited to the use of mass arrests without probable
14 cause and pre-charging imprisonment under inhumane conditions to disrupt and deter
15 demonstrators and First Amendment protected activity; the failure to maintain adequate
16 policies, and to adequately train, supervise and control OPD officers and ACSO deputies
17 concerning the policing of demonstrations and other expressive activities with respect to
18 crowd control, crowd dispersal and the constitutional and statutory limitations on arrests and
19 imprisonment.

20 104. As a direct and proximate result of the conduct of defendants described herein, the
21 named individual plaintiffs have been denied their constitutional, statutory and legal rights as
22 stated below, and have suffered general and special damages, including but not limited to,
23 mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation,
24 embarrassment, discomfort, and anxiety and other damages in an amount according to proof.
25 105. Defendants' acts were willful, wanton, malicious and oppressive and done with
26 conscious disregard and deliberate indifference for plaintiffs' rights.
27 106. Defendants' policies, practices, customs, conduct and acts alleged herein have resulted
28 and will continue to result in irreparable injury to plaintiffs, including but not limited to

*Angell v. City of Oakland*
Complaint

violations of their constitutional and statutory rights.  Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein.  The plaintiffs and class members intend in the future to exercise their constitutional rights of freedom of speech and association by engaging in demonstrations and expressive activities in the City of Oakland and the County of Alameda.  Defendants' conduct described herein has created fear, anxiety and uncertainty among plaintiffs with respect to their exercise, now and in the future, of these constitutional rights.  Plaintiffs therefore seek injunctive relief from this court, to ensure that plaintiffs and persons similarly situated will not suffer violations of their rights from defendants' illegal and unconstitutional policies, customs and practices as described herein. Plaintiffs also seek injunctive relief in the form of an order requiring that defendants seal and destroy any records derived from plaintiffs' arrests, including fingerprints, photographs, and other identification and descriptive information, and all information, and biological samples and information obtained from such biological samples collected from the plaintiff class, and identify to the plaintiff class all entities and agencies to which such information has been disseminated; and that all such disseminated records be collected and destroyed.

107.   An actual controversy exists between plaintiffs and defendants in that plaintiffs contend that the policies, practices and conduct of defendants alleged herein are unlawful and unconstitutional, whereas plaintiffs are informed and believe that defendants contend that said policies, practices and conduct are lawful and constitutional.  Plaintiffs seek a declaration of rights with respect to this controversy.

### PRAYER

WHEREFORE, plaintiffs pray for judgment against defendants, and each of them, as follows:

1. For an order certifying the class defined herein pursuant to Federal Rules of Civil Procedure Rule 23(b)(2) and (3);

2. For preliminary and permanent injunctive relief restraining defendants from engaging in the unlawful and unconstitutional actions complained of above;

3. For preliminary and permanent injunctive relief requiring defendants to seal and destroy

*Angell v. City of Oakland*
Complaint

all records derived from this arrest, including all fingerprints, photographs, identification and descriptive information, and all biological samples and information obtained from such biological samples collected from the plaintiff class;

4. For entry of an order that disclosure be made in writing to plaintiffs and the Court as to all entities and agencies to which such material has been disseminated and by whom gathered; and that all records disseminated be collected and sealed, including all copies of such disseminated records that may have been subject to dissemination by others;

5. For entry of an order declaring the arrests null and void;

6 For a declaratory judgment that defendants' conduct complained of herein was a violation of plaintiffs' rights under the Constitution and laws of the United States and California;

7. For general and compensatory damages for violation of plaintiffs' federal and state constitutional and statutory rights, pain and suffering, all to be determined according to proof;

8. For punitive and exemplary damages in amounts to be determined according to proof as to the individual defendants;

9. For an award of statutory damages and penalties pursuant to Cal. Civil Code section 52(b) to be determined according to proof;

10 For attorneys' fees pursuant to 42 U.S.C. § 1988 and California Civil Code section 52(b) and section 52.1(h), and California Code of Civil Procedure section 1021.5;

11 For costs of suit;

12. For pre- and post-judgment interest as permitted by law;

13. For such other and further relief as the Court may deem just and proper.

14. Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: January 11, 2013

YOLANDA HUANG
DAN SIEGEL
ANNE WEILLS

By: _____
YOLANDA HUANG

Attorneys for Plaintiffs
Steven Angell, *et al.*

*Angell v. City of Oakland*
Complaint